## Beutel v. Camp Taylor Development Co.

(Decided May 14, 1937.)

WILLIAM ALPHA HUBBARD for appellant.

H. O. WILLIAMS for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

The United States Government, upon entering the World War, established Camp Taylor in Jefferson County, for the concentration and training of men for service. The government acquired title to 2,000 or more acres for the purpose and soon transformed what had been a sparsely settled suburb into active military quarters.

It was necessary to provide water for the occupants of the camp, and the government hastily constructed a system. The supply was obtained by tapping the mains of the Louisville Water Company. Facilities for light, heat, and power were also installed by the government. The service and supply pipes for the distribution of water were composed of wood; some say California redwood, others fir. The kind of wood is immaterial.

After cessation of the war the camp was abandoned. On March 21, 1921, a deed of trust was executed to a bank, under which as trustee, it was empowered to convey the tract in lots or parcels, as designated in a plat made a part of the deed of trust. On May 11, 1921, by special warranty deed, appellant purchased lot No. 1037, containing 45.09 acres, for $6,763.50, and took posses-

sion. At that time his tract was supplied with water by means of the pipes then in use. The same situation existed with respect of all other parcels of land conveyed under the deed of trust.

In June, 1921, some of the purchasers of the lots conceiving that water would be necessary to the enjoyment of their purchases, and realizing that the government would no longer supply the need, and with the idea that a profit might result, organized and incorporated the Camp Taylor Development Company. Seemingly a community enterprise, its main objective being to take over the distribution of water, gas, and electricity, to be accomplished through covenants in the titles conveyed to the several owners by the government for the mutual benefit of the owners of all of said parcels and the said easements, as well as for profit to its stockholders. The general plan was that any owner of a parcel of the purchased land might, by the purchase of one share of stock, become entitled to service upon payment of fixed assessments and charges.

Appellant became a stockholder and in April, 1922, entered into a written contract with appellee for water service and recevied this service until prior to November, 1932, when a controversy arose between the parties with respect to the continued supplying of water to him, which later resulted in the discontinuation of the supply. The pleadings develop the contentions of the respective parties.

On April 4, 1933, appellant filed his petition in ordinary, wherein, after setting out the historical facts above, he alleges that under his contract with appellee, in consideration of certain assessments and monthly service charges fixed in his contract, all of which he had paid, the appellant agreed to "furnish him through the pipe line underlying the grounds of Camp Taylor subdivision, water from the mains of the City of Louisville." He pleaded his readiness and ability to pay for continued service "under the terms of the contract."

Appellant specifically pleaded section 5 of the contract, which it is not necessary here to repeat, because it is patent even upon casual observation, that it dealt only with the rights of the company in the continued use of his property, the property of other lot owners, and the easements therein conveyed by the government to

the various purchasers. This clause is in no sense a basis of appellant's rights under the contract.

Appellant then alleges that on December 1, 1932, the defendant without right or just cause cut off his water supply and despite his protests and requests for a renewal of service, refused and has continued to refuse to supply him with water "through the said pipe line." This was done, as appellant says, in violation of his rights and damaged his property to the extent of $5,000, being the estimated difference between the market value of the property with and without the supply of water. He also alleges special damage to the extent of $2,500, as a direct result of the failure to supply the water service, wherefore he prayed damage in the sum of $7,500. Appellant filed with and as a part of his petition, the contract of April, 1922.

Demurrer to the petition was overruled, and appellee answered admitting appellant's ownership of the property, its corporate existence, but definitely denying all other allegations. In a second paragraph it set up much matter, historically or argumentative, which the lower court on motion struck out, because it pertained only to the "conversations and dissertations as to the history, past and future efforts of the Camp Taylor Development Company to supply water."

However, it did plead that with knowledge of its limitations to furnish water, due to its lack of capital and the uncertainty of the life of its wooden pipe lines, it had specifically provided in its articles of incorporation that it proposed to furnish a supply of water furnished to it by the Louisville Water Company's mains, and to distribute same through the system of pipes then underlying said property. It further pleaded as a part of the contract with appellant, and other subscribers:

"It is understood that the company's ability to operate depends upon its ability to purchase water delivered to it in the Camp Taylor mains by the Louisville Water Company, and the distribution of same to users through the pipe system now thereon, and in the event that it shall become impractical for it to carry out said plan of business, it may terminate this contract by written notice mailed to applicant, or by notice published in a Louisville daily newspaper for one issue." Section 9.

It is then alleged that the plaintiff's property is in a remote, sparsely settled portion of Camp Taylor, and that in order to continue to serve plaintiff it would require 1,500 feet of pipe line, followed by an allegation that the wooden pipe line had become so deteriorated by action of the natural elements that it not only failed to deliver water to plaintiff, but interfered with the supply of water to other consumers. It was also alleged that appellant was duly notified of the purpose to discontinue service to his property; further that the cost to it of putting in new supply pipes to service appellant's property would be approximately $1,500. It is specifically alleged that its articles of incorporation among other provisions recited that:

> "It should be understood that this corporation shall not be bound to furnish * * * water, * * * except as it may be able to buy one or more of said items, delivered upon its distributing lines by the producers thereof, upon such terms and conditions as will enable this company to distribute and resell said item or items at a reasonable profit through such facilities for distribution as now exist on this Camp Taylor property."

It then pleads its inability to distribute water through the existing facilities without loss to its subscribers.

After the ruling of the court on appellant's motion to strike, whereby he sustained same in part, the appellee filed an amended answer. So much of the pleading as need be noted, merely reiterated notice to appellant of its purpose to discontinue service, its rights under its charter, and the consequences of its continuation of service under the existing plan.

Appellant demurred to the amended answer, the court overruling same. Appellant then replied only to paragraph 1 of the amended answer, and controverted of record the remaining paragraphs. Paragraph 1 of the answer and the reply thereto need not be discussed, as the pleading had no bearing on the issue here. It is noted that no reply was filed by appellant to any part of the original answer remaining after the court struck out the portions thereof as above mentioned. It may be observed at this point that some portions of the answer did properly present an issue. With the pleadings in

this condition the court properly ruled that the burden was on appellee.

After the joining of issue the court heard proof offered by both parties, and at the conclusion directed the jury, on appellee's motion, to return a verdict for it. Proper exceptions were taken, motion for a new trial overruled, and appellant prosecutes this appeal.

The grounds, other than the foregoing, have to do with the admission of evidence charged to be incompetent; the rejection of evidence offered by appellee said to have been competent and improperly rejected. The main argument, however, is that the court improperly took the case from the jury and directed a verdict for appellee.

Observing so much of the history of the original construction as must have been known to the incorporators, it appears to have guarded its rights in limiting its obligation under the charter. Not only that, it wrote into the application for service to appellant, and in all applications, the provision contained in section 9 of the contract. The application is filed, and it is provided therein that when accepted by the company it shall constitute the contract. Section 4 also provides that the service shall begin on May 1, 1922, "and shall continue until the applicant shall request the company in writing to turn off the water and discontinue the service, or the company shall terminate the contract."

As stated in paragraph No. 9, it was understood that the company's ability to operate depended on two conditions: (1) The company's ability to purchase water delivered to it by the Louisville Water Company, and (2) the distribution of same to users in Camp Taylor through the pipe system now thereon.

The court in an opinion, which is certified as a part of the record, construed section 9 of the contract to mean that if it should become impracticable to carry out its plan to furnish water through the means then existing, the company had the right to terminate applicant's contract. Reading section 9 in connection with section 4 of the contract and portions of the charter, we agree that the court placed the correct construction on the contract. In its pleadings appellee said it was impracticable to continue service to appellant because the pipe, which served appellant, had become in such condition that it

not only failed to properly supply his demand for water, and the condition was such that the company could not continue to practically serve appellant and render adequate service to its other subscribers. It says that in order to continue service to appellant through his service pipe it would be necessary to replace the remaining entire system of metal pipes, at a cost of $20,000. It also pleads that to replace appellant's line of pipe in such a manner as to supply him with water it would require an outlay of more than $1,500. It also pleaded in the answer that appellant declined to enter into an agreement to the effect that if appellant would install his own pipe line, appellee as the agent of all subscribers would supply him with water, and in a general way pleads that the continued furnishing of water to appellant through his existing line would result in a loss to all other subscribers for the benefit of a few.

A plumber, who had assisted in installation of the system by the government, said that it was hurriedly and loosely constructed. He showed familiarity with the system up to the time of the trial, as he had lived in Camp Taylor during the whole period. He says that there was trouble with the system in 1919 and 1920; that the government had put in inferior wood; some of the pieces rotted, and the effect was to cause leaks. He had worked for the company at various times. In one week he repaired "something like 80 or 90 leaks." He repaired the pipe leading to appellant's property which is located on high land, three or four times. He also said the pipe was too big, and that owing to stagnation in the large pipe line it was impracticable to serve usable water to appellant without frequent flushings.

The chief witness for appellee was a hydraulic engineer, whose ability, experience, and qualifications were not put in question. This witness first made a study and survey of the entire Camp Taylor system. He tells of tests covering a period of several months, these tests being made by means of certain scientific instruments which we will not undertake to describe. By the means used he found much leakage in the entire system. Some of the tests made at night, when little water was being used and the pressure was low, showed a leakage of more than 250,000 gallons in twenty-four hours. He says he found more than thirty large leaks, and ostensibly these were repaired, reducing the daily

leakage about one-fourth. These repairs did not stop seepage all over the line. The leaks did not make a showing on the surface. The formation of the soil, a hard strata of clay near the surface, forced the water downward. Much of the leaking water showed up in various springs in the area. At several places in the system the company was unable to get sufficient pressure to supply subscribers, because the wooden lines back of these places would not stand the pressure. This situation was true as to appellant's place, which was shown to be some higher than most of the properties.

As to appellant's pipe lines, the witness made the test by closing the valves at a point on the street where his line connected. Witness says he found no "concentrated" leak. He found the pipes in "that section" in a general bad condition; "worse than any in the camp." Pressure could not be maintained there because of this condition. His opinion was that for the company, at the time it turned off appellant's supply, to have maintained pressure to amply supply him with water, would have endangered the entire system. Speaking of the pipes then used, he said: "It would have blown them out. They could not have operated at a higher pressure than they were."

This witness in summing up said that with the facilities then in use the company could not have conveyed water to appellant's property at its regular rate, "metering it to him at his house and barn, and have made a reasonable return on its investment." They would have had to maintain strong pressure in order to get water up there. That would have increased the leakage on the lower wooden lines, also on that line, and the company would have suffered a very serious loss by maintaining any kind of pressure on his line. He also said that to continue service to appellant would have interfered with service to other customers. Witness estimated that the pipes during service had depreciated in value more than 100 per cent.; he said: "In other words, they have become a distinct liability to the company, and impossible to operate through; they had reached that point when I made the test."

In addition to the testimony of the engineer, there was nonexpert testimony, not only as to the condition of the pipes in the whole system, but as to the pipes serving appellant. There was testimony showing the

impracticability of further service to appellant, with further service to other subscribers, in fact all others, with the system in its then condition, including the portion of line serving appellant.

There was testimony for the appellant to the contrary, which the court below characterized as "negative," and we agree with his use of the word. Witnesses, for the most part, said they had never observed any leaks; that there were no evidences of leaks on the surface of the ground. Pieces of pipe were produced which had been taken from appellant's line. It was contended that such pieces were sound and were holding water when dug from the ground. There was much of this character of evidence, but negative as it was it did not in the least tend to discredit the evidence based on a scientific survey of two months' duration. One witness for appellant, who had been connected with the company, insisted that appellant's line was in good, sound condition. He based his opinion on the fact that he saw no evidence of leaks, and the good condition of the pieces of pipe dug from appellant's property. The witness, however, said that in 1932 there were leaks mainly in the collars of the pipes, which were repaired by banding the collar. Other places were repaired with poplar wedges.

After a careful reading of the proof, we are of the opinion that appellee fully sustained the burden of proof, and succeeded in completely establishing its defense, that is, that due to the condition of the whole system of wooden pipes—particularly such as were on appellant's place—at the time of the discontinuance of service to appellant it could not continue such service without materially reducing its service to its other subscribers and at a continuing loss, in fact, as shown, with probability of being compelled to discontinue the entire service.

Controversy as to notice or no notice by appellee to appellant to discontinue service was eliminated from the case, as appears from the record.

Agreeing with the conclusions expressed by the court below in his opinion directing a verdict for appellee, we conclude that the judgment below must be, and it is, affirmed.